UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| WILLIAM W. MARTIN, | ) |
| Plaintiff, | ) Civil Action No. 5: 20-507-DCR |
| V. | ) |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, | ) **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the parties' cross-motions for judgment concerning Plaintiff William Martin's claim for long-term disability benefits. Specifically, Martin contends that Defendant Guardian Life Insurance Company of America's decision denying benefits was arbitrary and capricious but after reviewing the materials filed by the parties, the Court cannot agree with this contention. Having carefully considered this matter, the Court will deny Martin's motion and grant Guardian's motion for judgment.

**I.      PROCEDURAL BACKGROUND**

Martin worked as a circuit engineer at Copper River Management Company at all times relevant to this action. [Administrative Record, hereafter "AR," 444] He obtained policies of short-term disability ("STD") and long-term disability ("LTD") insurance coverage through his employer, which were issued by Guardian.

The LTD Plan includes the following definitions:

**Disability or disabled**: These terms mean that a current Sickness or Injury causes impairment to such a degree that You are:

- Not able to perform, on a Full-Time basis, the major duties of Your Own Occupation during the . . . the Own Occupation period.
- Not able to perform, on a Full-Time basis, the major duties of any Gainful Work after the end of the Own Occupation period.

**Own Occupation Period**: The first 24 months of benefit payments from this Certificate.

The Plan goes on to provide:

**When Payments End:** Your benefits from this Certificate will end on the earliest of the dates shown below:
- The date when You are no longer Disabled.
- The date You fail to provide Proof of Loss as required by this Certificate.
. . .
- After the Own Occupation period, the date You are able to perform the major duties of any Gainful Work on a Full-Time basis with Reasonable Accommodation.

[AR 223]

Martin filed for STD benefits after becoming unable to work on July 28, 2017. Guardian determined that he was not able to perform the major duties of his job on a full-time basis and awarded STD benefits. [AR 188, 3200] Martin eventually applied for LTD benefits, which Guardian paid from February 10, 2018, through February 10, 2020. [AR 1258] However, on March 4, 2020, Guardian issued a letter informing Martin of its decision that he was capable of performing sedentary or light-level work and was no longer disabled under the LTD plan. [AR 1258-61]

## II.  SUMMARY OF THE EVIDENCE

Martin reported a long history of back pain, exacerbated during Army training in April 2017. [AR 735, 2754] Military physicians prescribed Motrin and Flexeril but this did not relieve his pain. [AR 2719] On June 20, 2017, Martin presented to Mariann Johnson, M.D., at Patient First in Mechanicsville, Virginia, with complaints of continued back pain radiating

to his left knee. [AR 2719] Johnson noted that a lumbar x-ray showed mild degenerative changes including spondylitic spurring, facet hypertrophy, and disc space narrowing at the L5-S1 level. She diagnosed lumbago with sciatica and prescribed a Medrol dose pack.

Johnson referred Martin to orthopedic surgeon Claiborne Irby, M.D., who evaluated him on June 27, 2017. [AR 735] Irby observed that Martin's lumbar flexion was mildly limited but the remainder of his range of motion and strength were normal. Additionally, Martin had no sensory deficits and his reflexes were symmetrical. Johnson explained that the problem was likely muscular in nature and prescribed Voltaren and a course of physical therapy. [AR 736]

Martin continued to follow-up with Irby with complaints of worsening low back and left leg pain. [AR 731] Irby noted that straight leg testing and gait were normal in December 2017. Additionally, Martin had an EMG test, which was normal. [AR 691] Irby independently reviewed a CT myelogram performed on November 30, 2017, which showed minimal bulging on the left L5-S1 level. Irby commented that the "nerve root fill[ed] out normally," and he did not "see anything from a surgical or neurologic standpoint." [AR 692-93] Irby believed the problems were "mainly muscular and arthritis," and recommended that Martin follow-up with a physiatrist.

Martin then began treatment with Yaoming Gu, M.D., at the National Spine and Pain Centers. [AR 680] Martin reported that his primary area of pain was in his low back and that it was worsened by sitting, standing, walking, lifting, and driving. He reported that the pain was not relieved by anything. Gu observed that Martin's gait and posture were normal, but he had limited lumbar extension due to pain. [AR 681]

Martin underwent a "bilateral L3-4-5 medial branch block," but reported that he had no significant improvement from that procedure. [AR 681] Steven Brewer, PA-C agreed, based on the results of imaging studies, that Martin was an unlikely candidate for surgery, and encouraged him to follow-up with Dr. Gu to discuss an alternative injection treatment.

A lumbar MRI was performed on February 2, 2018. [AR 2455] It revealed mild lower lumbar degenerative disc disease and facet arthropathy producing foraminal narrowing at L3-L4; L4-L5; and L5-S1; and a small annular tear at L5-S1. Martin initiated treatment approximately three months later with Oliver James, M.D., at KyOne Health St. Joseph East Pain Management and Rehabilitation. [AR 914] By this time, Martin complained of low back pain and left lower extremity pain that radiated down to the bottom of his left foot. After reviewing Martin's recent MRI, Oliver commented that encroachment upon the traversing nerve root at S1 on the left side was likely causing Martin's pain. Accordingly, his treatment plan included a transforaminal injection at the L5-S1 region "almost as a selective nerve root block." [AR 915]

Martin reports that he had an adverse reaction to this injection and it is unclear whether he returned to Dr. Oliver for additional treatment. [Record No. 53-1, p. 4 n.30. *But see* AR AR 2673 (note from PCP stating, "EKG was NSR and exam was unremarkable. . . ." Martin declined Phenergan, stating "it's not that bad."] On August 1, 2018, Martin asked Dr. James to complete disability paperwork, but James declined to do so, instead ordering a functional capacity exam. [AR 1814] But it does not appear that Martin underwent an FCE at that time.

Richard Dartt, M.D., was Martin's primary care provider. On January 18, 2018, Martin presented to Dartt's office to "have paperwork filled out for disability" based on "bulging disc at L5 and L4 degeneration." [AR 2663] Angela Smith, APRN noted that the office had never

treated Martin for "anything back related" and there was "nothing in the records to indicate he should be on disability." [AR 2667] She recommended that Martin discuss the issue with "his treating surgeon."

Martin returned to Dartt's office to review his lumbar MRI in February 2018. Smith reported that she "[could not] see anything on [the] MRI to explain the excruciating pain he describe[d]." [AR 2672] Smith advised Martin to get specialist advice on how to proceed. She offered to set up physical therapy but Martin declined, indicating that it was too painful. Martin returned to Dartt's office in June 2018 complaining of worsening back pain and seeking referral to a neurosurgeon. [AR 2679] He received steroids, a Toradol injection and a referral to a neurosurgeon at the University of Kentucky. [AR 2683]

Martin returned to Dartt in July 2018 "to have paperwork filled out." [AR 2685] Smith once again administered Toradol and prescribed steroids. She noted that Martin's consultation with the neurosurgeon was scheduled for July 24, 2018. [AR 2689] He returned to Dartt's office in October 2018 and stated that he had almost collapsed due to severity of low back pain. [AR 2696] Additionally, he reported that his son was concerned with "involuntary hand movement." However, Smith noted that no tremors were observed during the exam. [AR 2700] Martin had been referred to Dr. Lester at Cardinal Hill Pain Management per his request but had not yet been called with an appointment. Smith recommended he follow through with the referral to Dr. Lester. And if Martin continued to have concerns with the tremor, the next step would be a neurology referral.

Martin was evaluated by Dr. William J. Lester on February 20, 2019. [AR 2717] Martin complained of tenderness in the paraspinal muscles and rated his pain as five to six out of ten. Dr. Lester diagnosed chronic back pain. He saw Lester monthly through May 2019

and then in September 2019. [AR 2713] Lester responded to Guardian's request for information on September 30, 2019, as follows: Martin could return to work on September 30, 2019, but could not sit longer than four hours, stand longer than three hours, or walk longer than two hours. [AR 1413-21; 1990] Further, he could not perform any repetitive bending and could not stand or sit for longer than an hour without changing positions. [*See also* AR 1411-13.] Lester also noted that Martin's pain was adequately controlled with over-the-counter medication.

Martin began treatment at the Arthritis Center of Lexington in July 2019. [AR 2763] Alexander Brown, M.D., performed an extensive physical exam and checked for rheumatoid factor, which was negative. Brown observed that "[t]he amount of pain he has in his low back and joints seems out of proportion to the findings on his MRI and physical exam." [AR 2766] Brown's differential diagnosis included fibromyalgia and chronic back pain from osteoarthritis. While less likely, Brown also sought to rule out the possibility of spondyloarthritis or occult malignancy. [AR 2767] Based on results of further testing, Brown concluded in August 2019 that the back pain was due to lumbar degenerative arthritis. [AR 2772] Brown prescribed duloxetine and advised Martin to return in four to six months.

Guardian conducted surveillance of Martin as the end of the "own occupation period" approached in October 2019. [AR 2024-36] Martin was observed driving without difficulty, transferring in and out of his vehicle, ambulating short distances without difficulty, and walking up and down short flights of stairs (occasionally without use of railing). Shortly thereafter, Guardian interviewed Martin over the phone. [AR 516] At that time, he stated that he only drove to the doctor—about one or two miles weekly. He also reported that he had

difficulty getting in and out of the vehicle which was inconsistent with what was seen on the surveillance video. Martin also reported that he had to lean on railing to go up and down stairs.

Martin completed an Activities of Daily Living Questionnaire in December 2019. [AR 1422-24] He reported constant pain in his lower back with numbness going down his left leg. He reportedly spent his day primarily in bed or on the couch. He could no longer do any of the social or leisure activities he previously enjoyed such as hunting or fishing. Martin described his pain as constant and "to the point of tears." He reported that it was relieved only by resting. [AR 1426] Having determined that he was able to perform light to sedentary work, Guardian denied further benefits on March 4, 2020. [AR 1258-61] Martin sought reconsideration and submitted additional medical documentation. [*See* AR 1549, 2154, 2444-52]

Martin began physical therapy on April 30, 2020. [AR 2794] Hagan Ray, PT[1] observed that Martin had a decreased lumbar lordosis, slumped posture, posterior pelvic tilt, and significantly decreased range of motion in all planes. Martin complained of pain with all movements. Manual muscle testing of the lower extremities and trunk ranged revealed diminished strength.

Martin complained of increased pain following his first physical therapy treatment. Additionally, he was "hypersensitive to touch" and, therefore, did not tolerate manual therapy well. [AR 2798] He reported no improvement at his third visit and complained of increased pain with exercises. [AR 2800] By his fifth session, Martin demonstrated an improved

---

[1]   The parties incorrectly refer to this treatment provider as "Ray Hagan."

tolerance to therapeutic exercise, with fewer complaints of pain. [AR 2802] He attended two more sessions, concluding on May 21, 2020—it appears he did not return after that. [AR 2804]

Ray provided her opinion regarding Martin's functional abilities on May 21, 2020. [AR 2835] Ray stated that Martin had chronic low back pain with left lower extremity referred pain, decreased lumbar active range of motion; decreased core and lower extremity strength; and pain, which limited all activities. Ray reported that Martin was "unable to perform any activity during sessions without complaints of pain in low back." Further, she opined that he would only be able to sit for ten to fifteen minutes at a time and would only be able to stand or walk for five to ten minutes at a time. [AR 2834] Ray assessed other significant limitations including only the occasional ability to lift one to five pounds and indicated that he could not be expected to attend full-time work. [AR 2835]

Martin retained Frank Burke, M.D., to perform an independent medical examination ("IME") on May 21, 2020. [AR 2823-26] Burke observed that Martin's lumbar range of motion was limited, his lower extremity strength was 5/5, and he ambulated without a limp across the parking lot and in the clinic. [AR 2825] Burke concluded that, because Martin's previous work was "heavy physical labor," he would be unable to return to that job. He also opined that Martin could not perform activities that required prolonged sitting or any type of repeated bending, due to his "unresolved and basically untreated facet arthropathy with associated radicular pain pattern in the left lower extremity." [AR 2826] Burke explained that discectomy and foraminotomy at the L5-S1 level has a low rate of success and "[i]t is for this reason that the spine surgeons have not recommended surgical intervention" for Martin.

Stephanie Turner, PT, DPT, performed a functional capacity evaluation ("FCE") on May 26, 2020. [AR 2810-2821, 3026] Turner determined that Martin was able to sit frequently

- 8 -

and could occasionally lift and carry five to ten pounds, stand, walk, go up and down stairs, push and pull, reach and grip. She reported that Martin could rarely perform fine motor activities, kneel, lift and carry 15 pounds, and go up and down ladders. Further, she determined he could not bend, stoop, twist, crouch, or crawl. Although he could almost perform sedentary work, she believed he was unable to do so because he could only sit for 2.5 to 5.5 hours per day. Additionally, she commented, most sedentary jobs require frequent fine motor skills and he could only do such activities rarely due to the tremors in his hands. [AR 2812]

Martin retained certified vocation evaluator Stephanie Barnes to perform a vocational evaluation on June 8, 2020. [AR 2828-32] Barnes opined that Martin could not sustain full-time work even at a sedentary level. Relying on the opinion of Dr. Lester, she determined that Martin would not be capable to sustaining the sitting required to perform sedentary work or the time on his feet to perform light work. [AR 2832] Barnes also noted that Martin had limitations due to hand tremors which prevented sustained fine motor use or gripping.

Martin returned to Dartt's office in June 2020 seeking completion of paperwork. [AR 2925] Angela Smith, APRN, noted that Martin's blood pressure was elevated and he had "an obvious tremor." [AR 2929] She also noted that she had "done a workup on his back and he was referred to a neurosurgeon which could not find anything wrong with his back and did not see any need for restrictions on activity. MRI showed mild lower lumbar DDD, otherwise no clinical indication for his degree of pain." Dartt further remarked that she could "see no need for disability." Martin was prescribed blood pressure medication and advised to return in seven to ten days.

Guardian asked Dr. Dartt to review Martin's FCE results on August 3, 2020. Dartt responded simply: "Absolutely have not treated or found reason for disability." [AR 2852-53]

Guardian asked Dr. Lester to review the FCE results one week later. When asked whether he agreed with the results of the FCE, Lester remarked that he had not seen Martin since September 16, 2019, so he could not disagree. [AR 2857] With respect to objective examination findings that supported the restrictions and limitations, Lester noted that he did not observe any tremor when he last saw Martin. Guardian also asked Dr. Brown to review the FCE. On August 27, 2020, Brown indicated that he agreed with the results of the FCE, citing "tender lumbar spine with range of motion." [AR 2906]

Shortly thereafter, Guardian decided that additional information was needed to resolve Martin's appeal. Guardian contacted Martin's attorney concerning the possibility of Martin attending an independent medical examination by a physician selected by Guardian. [AR 3039] But Martin expressed hesitation about attending an examination at an "unknown location" during the COVID-19 pandemic. Guardian construed this as Martin's refusal to attend an IME and, therefore, sought an independent peer physician panel review, which consists of a paper review of the medical evidence on file by an outside medical consultant.

Amparo Gordian, M.D., a board certified physician in internal medicine and rheumatology, reviewed Martin's medical records on October 20, 2020. [AR 3126-31] After summarizing Martin's medical history, Gordian noted that his diagnoses were "chronic back pain and degenerative disc disease." He concluded that Martin could perform sedentary work, which includes exerting up to 10 pounds of force occasionally for up to one third of the time. A sedentary job requires lifting a maximum of 10 pounds and occasionally lifting, pulling, and pushing. In a standard eight-hour workday, a sedentary position would require an employee to sit for about six hours of the day and walk or stand for a maximum of two hours.

Gordian opined that Martin's subjective complaints (and the FCE determination) were not consistent with the objective medical evidence. [AR 2972] For instance, he reported problems with fine motor skills and numbness, but his nerve conduction study was normal. Further, his lumbar MRI was inconsistent with the degree of back pain of which he complained. The neurosurgeons who saw Martin diagnosed only mild disc disease and stated he was not a surgical candidate. Gordian also noted that surveillance footage showed Martin being active, suggesting at that he could at least perform sedentary work. Gordian remarked that this conflicted with the limitations placed on Martin's functional capacity by physical therapist Stephanie Turner.

Jamie Lewis, M.D., a physical and pain medicine doctor, also reviewed Martin's records for Guardian on October 20, 2020. [AR 3132-40] Lewis noted that he had diagnoses of lumbar degenerative disc disease and foraminal stenosis. Lewis concluded that Martin had functional limitations secondary to chronic pain and muscle spasm with a limited range of motion. However, he was not a surgical candidate. His electrodiagnostic studies had been normal and MRI studies did not identify any "dangerous findings." Instead, the MRIs revealed mild lower lumbar degenerative disc disease and facet arthropathy producing mild to moderate neural foraminal narrowing. And there was only a small annular tear at L5-S1.

Lewis opined: "[i]t is not clear why the claimant would not have the ability to function at a sedentary level in my opinion, given the lack of any neurological compromise and considering that he is not a surgical candidate." Further, from a physical medicine/rehabilitation and pain perspective, Lewis believed there was no contraindication to Martin returning to work at a sedentary to light physical level based on the identified pathology and physical findings.

Lewis concluded that Martin could sit for 60 minutes at a time, up to six hours per day and that he could walk and stand 20 minutes at a time, up to four days per day. [AR 3138] Like Gordian, Lewis believed that Martin's subject complaints were out of proportion to the clinical findings reported. [AR 3138] Both Gordian and Lewis attempted to speak with Martin's treating physicians, but their calls were not returned.

Finally, on October 29, 2020, Clinical Nurse Consultant Amy Gilmer was asked to review Dr. Burke's May 2020 IME. Gilmer remarked that there was no objective medical evidence to preclude Martin from performing any occupation after reviewing the medical evidence from May 2015 through October 2020. [AR 3071-86] She acknowledged that certain evidence, such as the opinions of Drs. Lewis and Gordian and physical therapists Hagan Ray and Stephanie Turner, supported limitations. However, Gilmer pointed out that a lower extremity EMG was normal and a lumbar MRI and x-ray showed only mild degenerative changes. [AR 3084-85]

Gilmer opined that the extreme limitations assessed by Dr. Burke and Stephanie Turner, PT, were not supported by the medical records and/or objective medical evidence. [AR 3085] For example, on May 21, 2020, Dr. Burke documented 5/5 strength in the lower extremities. Also in May 2020, Martin's physical therapy was placed on hold after he reported increased endurance and strength. And while Stephanie Turner, PT noted "tremors in both hands," Ms. Smith APRN noted "slight tremors" in June and October 2020. [AR 3086]

Guardian finally denied the claim on November 6, 2020. [AR 3088-3106]

### III.   STANDARD OF REVIEW

Both parties agree that this action is governed by ERISA, and the Court previously determined that arbitrary and capricious review applies in this case. *See* 29 U.S.C. §

1132(a)(1)(B). [Record No. 49] This highly deferential standard of review "is the least demanding form of judicial review of administrative action." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, the outcome is not arbitrary or capricious. Therefore, if the decision is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," the decision will be upheld. *Glenn v. Metro Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006). While the arbitrary-and-capricious standard is highly deferential, the Court does not merely rubber stamp the administrator's decision. *Id.* Instead, it reviews "the quality and quantity of the medical evidence on both sides of the issue" to determine whether the administrator's decision should be upheld. *Id.*

## IV. DISCUSSION

Several factors guide the Court's decision in determining whether the administrator's decision is the product of principled reasoning and substantial evidence. They include "the quality and quantity of the evidence; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to physical examination of the claimant." *Shaw v AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015).

### A. Quality and Quantity of the Medical Evidence

Substantial, good-quality medical evidence supports the administrator's decision. Martin's primary care provider, Dr. Dartt, did not report any objective findings to support Martin's extreme complaints and believed there was no reason for disability. Likewise, the treatment notes of rheumatologist Dr. Brown indicated that Martin's complaints were not

supported by objective findings. While Brown later agreed with the results of Martin's extremely limiting FCE, he gave vague reasons for doing so that were not supported by his earlier treatment notes. Additionally, Dr. Lester, who actually examined and treated Martin, did not report objective findings consistent with extreme limitations on function and ultimately concluded that he could return to work.

The Plan required Martin to provide proof of loss consisting of objective medical evidence. This includes, but is not limited to, "diagnostic testing," "laboratory reports" and "medical records of a doctor's exam documenting clinical signs, presence of symptoms and test results consistent with generally accepted medical standards supported by nationally recognized authorities in the health care field." [AR 252] Martin has not identified any objective testing that correlates to the level of disability he claims. While he has provided MRI results indicating mild low back degeneration, he has not identified any testing related to his alleged hand tremors.

It is notable that the evidence weighing in favor of disability is evidence that Martin obtained *after* Guardian denied benefits in May 2020. Further, Dr. Burke was not a treating source and his opinion was based, in part, on speculation regarding the reason neurosurgeons had advised against surgery. And as noted by independent reviewers Lewis and Gordian, the extreme limitations assessed by therapists Ray and Turner were not supported by objective findings.

Martin criticizes Guardian's failure to have an independent medical source examine him. However, a plan administrator's failure to conduct a physical examination is but one factor the Court considers in determining whether it acted arbitrarily and capriciously. *See Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005).

While failure to conduct a physical examination may raise questions about the thoroughness of the benefits determination, there is no indication here that the file reviews were inadequate. Further, Guardian's decision to have independent physicians review the files was particularly reasonable in light of Martin's apparent refusal to travel to an examination location.

Dr. Lewis reviewed records from 2015 through 2020, including reports from Drs. Lester, Brown, and Burke, and therapists Ray and Turner. Lewis gave reasons for disagreeing with the limiting opinions of these sources to the extent that Martin had no neurological symptoms and had no evidence of joint inflammation or synovitis. [AR 3137] Lewis attempted to contact Dr. Dartt on two occasions but his calls apparently were not returned.

Dr. Gordian also reviewed medical records ranging from 2015 through 2020, including EMG and MRI results, a July 2018 neurological report from Catherine Wang, M.D., and the FCE report. Gordian attempted to contact Dr. Brown twice but his calls also were not returned. [AR 3127] Gordian concluded that Martin could perform sedentary work based on the FCE and the lack of objective symptoms. [AR 3129] Gordian further commented that Martin "appeared active" on surveillance, suggesting that he at least could perform full-time sedentary work.

Finally, Martin points out that courts have reversed a plan administrator's decision denying disability benefits where the administrator ignored evidence from a treating physician. To the extent Martin argues that Lewis and Gordian were not provided *every* treatment record or report from various sources, he has not explained how these often duplicative documents would change the analysis. Further, it there is no indication that Guardian ignored any medical records simply because they were not presented to Lewis or Gordian.

### B. Conflict of Interest

"Where a plan authorizes an administrator 'both to decide whether an employee is eligible for benefits and to pay those benefits,' it creates 'an apparent conflict of interest.'" *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007). In evaluating this conflict, the Court must "look[] to see if there is any evidence that the conflict in any way influenced the plan administrator's decision." *Evans v. UnumProvident Corp.,* 434 F.3d 866, 876 (6th Cir. 2006).

Martin asserts that Guardian's decisionmakers were aware of his $6,100 per month benefit, which provided them an incentive to deny benefits. Further, he reports that Guardian's decisionmakers receive annual bonuses and that Guardian's annual statements from 2019 and 2020 show that its net gain from disability was $244,402,539 and $292,398,867, respectively. [Record No. 53-1, p. 25] However, despite being permitted discovery on the subjects, Martin has not alleged that the decisionmakers' annual bonuses were tied to the outcome of disability claims. And the fact that Guardian was profitable in the relevant years is not sufficient to show that a conflict of interest existed. Accordingly, there is no evidence that a conflict affected the administrator's decision to terminate Martin's LTD benefits.

### C. Use of Contract Physicians

"[W]hen a plan administrator both decides claims and pays benefits, it has a 'clear incentive' to contract with consultants who are 'inclined to find' that a claimant is not entitled to benefits." *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009) (quoting *Kalish v. Liberty Mutual/Liberty Life Assur.*, 419 F.3d 501, 507 (6th Cir. 2005)). Lewis and Gordian work for MLS National Medical Evaluation Services ("MLS"). Martin contends that Guardian's use of MLS to "routinely retain reviewers resulting in significant

percentages of denials" weighs in favor of reversing Guardian's decision. Through discovery, Guardian disclosed that Gordian's opinions resulted in the denial of 80 percent of claims and Lewis's resulted in 75 percent denial of claims. Further, Nurse Gilmer's opinions resulted in 53 percent claim denial.

But as Guardian points out, it is natural that these reviewers have a relatively high rate of denials since they review appeals of claims that have already been denied. Further, in this particular case, there is nothing to suggest the reviewers wrongfully recommended denial. Drs. Lewis and Gordian reviewed a substantial amount of medical information and reasonably concluded that the objective evidence did not support the extreme limitations alleged.

### D. Consideration of Social Security Administration Decision

Martin filed an application for Disability Income Benefits on June 29, 2018, alleging disability beginning July 29, 2017. [AR 2429] The ALJ determined that Martin had the severe impairment of degenerative disc disease but retained the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except he would be limited to occasional postural maneuvers. The ALJ was unpersuaded by Martin's allegations regarding the severity of his functional limitations, noting the absence of objective evidence and Martin's reported ability to shop, drive, attend his son's ball games, and go out with his wife. Not inconsistent with Guardian's decision, the ALJ found Martin not disabled under the Social Security Act on May 20, 2020. Accordingly, this factor weighs in favor of upholding Guardian's decision.

### E. Guardian Identified Occupations Martin Could Perform

In determining that Martin was no longer disabled, Guardian relied upon the opinion of Vocational Rehabilitation Specialist Angela Plemons, who concluded that he was capable of

performing three occupations: electrical engineer (light duty); computer security analyst (sedentary); and logistics engineer (sedentary). [AR 538, 1278-79] Martin contends that electrical engineer is the same as his previous occupation of circuit engineer, which Guardian already determined he could not perform.

Martin correctly points out that Guardian originally assigned his position of circuit engineer a physical demand level of light and a specific vocational preparation ("SVP") level of 8, as well as the same DOT number and occupational category as the position of electrical engineer. However, Martin's job with Copper River could not be modified to account for any of his physical limitations at the time. [*See* AR 740.] Guardian's analysis included information indicating that the majority of electrical engineering positions allowed for periodic alternating between sitting and standing so that pain or discomfort might be relieved. [*See* AR 1272.]

Further, Martin incorrectly shifts the burden to Guardian to prove that he was no longer disabled. The Policy required Martin to provide ongoing proof of his disability, including objective medical evidence and proof of his restrictions, within 30 days of any request by Guardian. [AR 239-241] Accordingly, Guardian did not have the burden of proving that Martin became able to perform the job of circuit engineer. Instead, he had the burden of proving that he remained unable to perform it. And as explained herein, he failed to sustain that burden.

Finally, Martin contends that the position of logistics engineer did not meet the minimum hourly pay requirements for "gainful work." According to Martin, any job had to pay at least 60 percent of his previous earnings or $35.63 per hour. He also contends that the Policy requires that his Indexed Insured Earnings be adjusted annually for 2019 and 2020,

which would have increased the minimum pay rate to $36.45 per hour. The position of logistics engineer only paid $35.39 per hour.

Guardian responds that it has discretionary authority to interpret the minimum pay rate calculations under the Plan. Regardless, it contends, the position of computer security analyst had positions paying $40.33 per hour, which exceeds the minimum rate cited by Martin. Martin does not dispute that Guardian is not required to identify any specific number of gainful occupations Martin might perform. Accordingly, Guardian has satisfied its burden by identifying the sedentary position of computer security analyst with a pay rate of $40.33 per hour.

V.   **CONCLUSION**

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. Plaintiff William Martin's Motion for Judgment [Record No. 53] is **DENIED**.

2. Defendant Guardian Life Insurance Company of America's Motion for Judgment [Record No. 56] is **GRANTED**.

Dated: September 13, 2021.



Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky